No. 9030.

SWANBROUGH v. UNITED COMMERCIAL TRAVELERS.

1. LIFE INSURANCE—*Construction of Policy.* The terms of a policy of life insurance are to be considered in the light of the common understanding, at the date thereof.

2. POLICY CONSTRUED. An exception from liability, for "death or disability resulting from riding or driving races, or voluntary exposure to danger," found in a policy issued in 1908, held not limited to horse-racing but to extend to a death occasioned in driving an automobile race.

3. EVIDENCE—*Judicial Notice* taken, that racing with auto cars has been practiced for many years, and is as frequently attended by accidents as horse-racing.

4. WORDS AND PHRASES—*Driving,* construed to apply to the operator of an auto car or one riding a bicycle.

*Error to Denver District Court, Hon. H. S. Class, Judge.*

Messrs. DAYTON & DENIOUS, and Messrs. O'DONNELL, GRAHAM & O'DONNELL, for plaintiff in error.

Mr. ARCHIBALD A. LEE, and Mr. WATT G. SHELDEN, for defendant in error.

Mr. Justice Scott delivered the opinion of the court.

Opinion by Scott, J.

EDWARD W. SWANBROUGH was a member of the Order of United Commercial Travelers of America, a fraternal benefit society, and carried a benefit certificate therein. He was killed in an automobile accident on the 25th day of September, 1904.

The plaintiff in error, plaintiff below, widow and beneficiary of Swanbrough, brought this suit to recover on his benefit certificate. The benefit certificate was in the following words:

"This Certicate Witnesseth, that Edward W. Swanbrough has been duly enrolled in The Grand Commercial Army and is a member in good standing of Pikes Peak Council No. 15, at Denver, Colorado.

He is hereby insured in a sum not exceeding sixty-three Hundred ($6,300.00) Dollars, provided he shall sustain, during the continuance of his membership, and while in good standing, bodily injury effected through external, violent and accidental means, which alone, shall occasion death

immediately or within six months from the happening thereof, subject to the provisions, conditions and requirements of the Constitution of The Order of United Commercial Travelers of America. He is further entitled to all the rights and privileges of membership accruing to him under the Constitution, and he is hereby recommended to the fraternal courtesy of the Brotherhood wheresoever dispersed."

In Witness Whereof, We have affixed our signatures and the Seal of The Supreme Council in the name of the Beneficient Father of all, this 21st day of August, 1908.

This certificate was qualified by the following exemptions:

"Benefits under this article shall not cover nor extend to any death, disability or less received while the insured member is acting as an aviator or baloonist, sailor or soldier, or is playing professional baseball, or is under the influence of liquor or narcotics in any degree; nor shall such benefits cover or extend to any death, disability or loss resulting from fighting, riding or driving races, over-exertion (unless in an effort to save human life), riot, the moving or transportation or use of gunpowder or dynamite, or other explosive substances, medicinal or surgical treatment (except when the surgical treatment is made necessary by the accident), mining, the intentional taking of medicine or drugs, the violation of any law, immoral conduct, intentionally self-inflicted injuries (fatal or otherwise) self destruction (while sane or insane), inhaling of gas or asphyxiation (voluntary or involuntary, conscious or unconcious) murder or disappearance, injuries (fatal or otherwise) intentionally inflicted by others (except where such injuries are inflicted for the sole purpose of burglary or robbery or by an insane person, the intent to commit burglary or robbery to be established by the claimant and the insanity to be established by a court having competent jurisdiction), or from voluntary exposure to danger; nor shall benefits cover or extend to any one of the following conditions, whether caused by accidental means or not, to-

wit:   Appendicitis, fits, epilepsy, mental infirmity, ivy poisoning, ptomaine poisoning or other poisoning, bite or sting of an insect, or any infection (unless the infection is introduced into, by and through an open wound, which open wound must be caused by external, violent and accidental means, and be visible to the unaided eye), hernia, orchitis, inquinal adenitis, venereal diseases, cerebral or meningeal or spinal hemorrhage, heat prostration, sunstroke or sunburn."

The certificate was also made subject to a rule of construction as follows:

"This certificate, the Constitution, By-Laws and Articles of Incorporation of said Order, together with the application for insurance signed by said Insured Member, shall constitute the contract between said Order and said Insured Member and shall govern the payment of benefits, and any changes, additions or amendments to said Constitution, By-Laws or Articles of Incorporation, hereafter duly made, shall bind said Order and said Insured Member and his beneficiary or beneficiaries, and shall govern and control the contract in all respects."

It seems that the provisions of the certificate were based on like provisions of the Constitution and by-laws of the society.   The defense of the society was that Swanbrough met his death while driving a race, and by voluntary exposure to danger, both prohibited by the terms of the exemptions to the certificate.

The only testimony in the case was that of the plaintiff whose testimony may be epitomized as follows:

"I was present when Mr. Swanbrough was killed in an automobile accident on September 25, 1914, at Overland Park track.   I saw the accident.   It occurred in the course of a race in which Mr. Swanbrough was running an automobile.   I was in the grand stand.   I do not know how fast he was running.   He was running around the mile track in front of the grand stand.   There were about a half dozen other automobiles in the race.   I had seen the car on the morning of the race, and knew at that time that Mr. Swan-

brough was going to enter one or more races at Overland Park that afternoon. It was in the course of one of these races that Mr. Swanbrough was killed. It was the second race he had driven that afternoon."

At the close of plaintiff's testimony the defendant society, moved a non-suit, which motion was sustained by the court and the case was dismissed. This judgment is before us for review.

The specific exceptions relied on by the defendant are "Nor shall such benefits cover or extend to any death, disability or loss resulting from fighting, riding or driving races, nor, etc.," and, "or from voluntary exposure to danger, etc." The sole contention of the plaintiff is, that the words "riding or driving races," refer exclusively to horse racing, and horse races, and not to automobile races, or similar contests; that this is the common and ordinary understanding of the ordinary person.

No decided case is cited to sustain this contention, but many definitions of the words, "races," "riding" and "driving," are set forth covering a period from the time of Jehu to modern times, and which are urged as supporting that view.

The certificate was written in 1908, and we think the term "riding or driving races," must be considered in the light of the common and general understanding of the term at that time. It is a very broad and general expression and unless it can be said to have been generally confined in its common use to the technical or exclusive meaning of riding or driving horse races, we cannot so limit it.

While before the invention and general use of automobiles, bicycles, motor cycles and other means of locomotion, there may have been some justification for the contention that the term "riding and driving races" should be held to refer to horse races only, such a contention cannot be justified at this period of history. Courts cannot hold themselves ignorant of the common knowledge that now and for many years last past automobile and bicycle races are as common if not much more so, than horse races, This fact

is not only common knowledge, but the terms as applied to "driving" and "racing," with automobiles and bicycles, have been generally written in city ordinances, state statutes, and so treated in judicial decisions.

Neither can we overlook the fact which is common knowledge, that automobile racing is as dangerous, in that accidents are as frequent and the results as serious at least, as horse racing, and was so, long prior to the writing of the certificate. Then by what authority may we construe the general term to be limited to horse racing, any more than we may limit it to automobile racing. Clearly the broad term "driving races" as commonly understood, may include automobile races, as well as horse races.

In Vol. 18 Enc. Britannica, p. 916, we have a very general account of automobile racing, from which we quote:

"Progress in the improvement of design was slow until the year 1894, when a great impetus was given to the French industry by the organization, by the Petit Journal, of a trial run of motor vehicles from Paris to Rouen. The measure of success attained by the cars caused considerable surprise, and in the year 1895 a race was organized from Paris to Bordeaux and back, a distance of 744 m., when the winning vehicle covered the journey at a mean speed of 15 m. per hour. From that date onward, until 1908, racing played an important part in the development of the motorcar; in fact it is not going too far to say that, up to 1904, it played a vitally important part therein."

And again:

"But it stood out in bold relief when an English car wrested the international trophy from its French rivals in 1902. The Automobile Club of Great Britain and Ireland (now the Royal Automobile Club) at once secured parliamentary sanction for the use of certain roads in Ireland for a limited period, and proceeded to organize a race worthy of the issue at stake. The race was won by the Mercedes car, the latest production of the famous house of Daimler."

The terms "driver" and "driving" as applied to an operator of an automobile was and has been in common use, in

general conversation, in newspapers, in statutes of regulation, and in judicial opinions, for many years before the date of the certificate in question. It is so used in the Denver Municipal Code of 1906, in our state statute, Chap. 114, Laws 1913. It is so defined in 28 Cyc. p. 24; it has been so used without question or quibble in the decisions of our own appellate courts, long prior to the issuance of the certificate in question.

In the case of *Hannan v. St. Clair*, 44 Colo. 134, 96 Pac. 822, published in the same year that the certificate was written, it was said, among other references to the "driver" of the automobile:

"The testimony was, we think, sufficient to sustain the judgment. It clearly showed negligence on the part of the driver of the automobile. The driver was on the wrong side of the street."

See also *Kent v. Treworgy*, 22 Colo. App. 441, 125 Pac. 128; *Kent v. Cobb*, 24 Colo. App. 264, 133 Pac. 424; *Gibson v. Deupree*, 26 Colo. App. 324, 144 Pac. 1133; *Phillips v. Denver Tramway Co.*, 53 Colo. 458, 128 Pac. 460, Ann. Cas. 1914B 29. The term has been so used by the appellate courts of other states, without exception, and insofar as we have been able to ascertain, without question.

It is said in Berry on the Law of Automobiles, 1916 Ed. sec. 204:

"The words 'ride or drive,' as used in a statute providing a penalty for 'riding or driving' faster than a common pace in the compact part of any town, are not limited in their application to persons riding or driving animals. Anything ridden or driven comes within the purview of the act. The words apply to the operation of automobiles, and it is not material thaat automobiles were unknown to the legislators at the time the act was passed."

It was held as early as 1879, by the Court of Queen's Bench, 4 Q. B. D. 228, construing a statute prohibiting "furiously driving a carriage," that one may be convicted for "furiously driving a bicycle." It was said by Mellar, J.:

"I am of opinion that the decision of the magistrates was

right.   The words of the section are, 'if any person riding any horse or beast, or driving any sort of carriage, shall ride or drive the same furiously so as to endanger the life or limb of any passenger.'   The expressions used are as wide as possible.   It may be that bicycles were unknown at the time when the act passed, but the legislature clearly desired to prohibit the use of any sort of carriage in a manner dangerous to the life or limb of any passenger.   The question is, whether a bicycle is a carriage within the meaning of the act.   I think the word 'carriage' is large enough to include a machine such as a bicycle which carries the person who gets upon it, and I think that such person may be said to 'drive' it.   He guides as well as propels it, and may be said to drive it as an engine driver is said to drive an engine.   The furious driving of a bicycle is clearly within the mischief of the section, and seems to me to be within the meaning of the words, giving them a reasonable construction."

So here, it is clearly the object of the exemption to exclude liability in case of hazardous risks.   Particularly is this made apparent by the contract provision of non-liability in case of "voluntary exposure to danger."

Swanbrough was an automobile salesman; the society was a salesman's society, and his certificate was under class A, containing the specified exemptions.   In the light of his necessary understanding of the subject at the time, we can not say that he did not read the exemption in the light of the plain language in which it was written.

The only case decided by any of our appellate courts called to our attention, wherein the precise principle of construction was involved, is that of *State v. Thurston*, 28 R. I. 265, 66 Atl. 580.   This case was reported in 1908, and construed a penal statute enacted in 1901.   The court said:

"Gen. Laws Chapter 74, sec. 5, as amended by Pub. Laws Chapter 925, November 26, 1901, provides: 'Every person who shall ride or drive faster than a common travelling pace in any of the streets of Newport or Providence, or in the compact part of any town or village in the state, or in

any road leading from Pawtuxet to the compact part of Providence, shall, unless justifiable cause be made to appear for such riding or driving, be fined not less than five dollars nor more than twenty dollars or imprisoned not exceeding ten days for each offence.'

The language used in this section is exceedingly broad: 'Every person who shall ride or drive faster than a common travelling pace.' The words "ride or drive" are not confined to animals; they are not limited in any manner whatsoever. Anything capable of being ridden or driven comes within the purview of the act. It is argued that the words "ride or drive" are apt words in a statute designed to limit the fast driving of horses upon the highways of the State. They are apt, but they are not restricted to horses by the terms of the section. They are also apt in the case of bicycles, motor cycles, or automobiles when ridden or driven. In construing statutes of this kind it is usual and proper to consider the scope and purpose of the act and the danger or mischief that it was intended to guard against. The act was evidently passed for the protection of the public against the dangers incident to fast riding and driving of any sort, not only of the kind with which the legislators were familiar at the time, but also any kind of dangerous riding or driving."

As inimitably described by Lew Wallace, his hero, Ben Hur, was driving a race. Two thousand years later Barney Oldfield, midst like plaudits of the multitude, was driving a race. The one driving a chariot race, the other driving an automobile race. Both races alike were hazardous to the driver. Neither intervening time, nor the fact that the carriage of the one was propelled by Arabian horses of pure blood, while the carriage of the other was propelled by most delicately adjusted mechanical power, can alter the plain understanding that each was engaged in the driving of a race. Neither can all the definitions written in the centuries between change the common understanding of men, that linked together in thought, these men engaged in driving races. This is not only the fact, but it is the common

understanding of the fact, according to the usage and custom of the times.

So that we can not in reason, nor in the exercise of any just power, insert by construction in the exemption clause of the certificate, and before the word "races," any definite or descriptive word. In this case it is as reasonable for us to so insert the word "automobile" as the word "horse." We must construe the contract as of the plain meaning that its words imply.

Counsel urge the application of the rule which obtains in this court, applicable to purely benefit accident policies, as well as to the ordinary accident policy, that where there is ambiguity in the policy, all provisions, conditions or exceptions which may tend to work a forfeiture of the policy, or limit or defeat liability thereunder, should be construed most strongly against the insurer and most favorably toward the insured. More definitely, that when the exemption from liability is reasonably capable of two different constructions, that one most favorable to the insured should be adopted.

But the language in the exemption here considered is not ambiguous, nor is it reasonably capable of two different constructions.

We said in *Brown v. Knights of the Protected Ark*, 43 Colo. 289, 96 Pac. 450:

"If the contract were ambiguous or doubtful and were fairly subjected to different interpretations, it would be construed most strongly against the insuring association. But courts are required to enforce these contracts as they are written; in this respect they do not materially differ from other contracts; when they are voluntarily entered into and their terms are reasonably plain, the courts have no alternative; the fact that a particular provision may operate harshly or inequitably in particular cases does not justify a judicial disregard or reconstruction of the same."

It was said in *Standard Life & Accident Ins. Co. v. McNulty*, 157 Fed. 224, 85 C. C. A. 22:

"The natural obvious meaning of the provisions of a

contract should be preferred to any curious hidden sense which nothing but the exigencies of a hard case and the ingenuity of a trained and acute intellect would discover. *Delaware Ins. Co. of Philadelphia v. Greer,* 57 C. C. A. 188, 193, 120 Fed. 916, 921, 61 L. R. A. 137. The reasonable and probable meaning of a stipulation in an agreement should be preferred to one that is irrational and improbable. *Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota,* 57 C. C. A. 637, 121 Fed. 609, 611."

It is certain that the parties to this contract, excepted from indemnity injuries sustained while the insured was driving a race, and to say that he was not driving a race, when he met his death, is to distort the meaning of the English language, as commonly and generally understood.

In *Delaware Ins. Co. v. Greer,* 120 Fed. 916, 57 C. C. A. 188, 61 L. R. A. 137, the court said:

"Contracts of insurance, however, are not made by or for causists or sophists, and the obvious meaning of their plain terms is not to be discarded for some curious, hidden sense, which nothing but the exigency of a hard case and the ingenuity of an acute mind would discover."

In order that fraternal insurance societies may be preserved, and their membership as a whole protected, it is as imperative that each member shall fairly observe the rules of the society and the requirements of his contract of insurance, as that the society should meet its obligations when such requirements are observed by the insured.

The judgment is affirmed.

*En banc.*

Teller and Burke, JJ., dissenting.

Mr. Justice Teller dissenting:

The majority opinion treats the words "riding" and "driving" as present participles governing "races," while to my mind they are clearly adjectives qualifying the noun "races." The former construction is based in the opinion wholly on the fact that persons operating automobiles are properly described as "driving" them, and that automobile races were common when the certificate in question was issued.

This entirely overlooks the contention of plaintiff in error that the exemption clause, as a whole, makes the second named construction necessary.

The first provision of the exemption clause is that the benefits promised shall not extend to death, etc., "while the insured member is acting as aviator, etc., * * * or is playing professional baseball," etc. It should be noted that this clause expressly exempts from benefits members injured "while" doing specified acts, present participles being used with the auxilliary verb "is," forming sentences grammatically complete and requiring no construction.

In the next line the construction changes, and it is provided that such benefits shall not "cover or extend to any death, disability or loss resulting from fighting, riding or driving races, over-exertion (unless in an effort to save human life), riot, the moving or transportation or use of gunpowder," etc.

Here there is excluded from the exemption specified acts or events designated in each class by one word, a noun, governed by the preposition "from"; but followed by a class of events not expressed by one word, as before; but by a present participle and its object, which participle— "moving"—is, according to the rules of good English, preceded by the article "the," and followed by the preposition "of," e. g., "the moving of gunpowder."

Further along, in this clause, we find: "*the* intentional taking *of* medicine or drugs," etc.

Why should it be supposed that one, who thus wrote according to good usage, should, in a preceding line, have written bad English? How does it happen that the language is not: "the riding or driving of races," if the writer was using the two words as participles?

Again, why should the writer adopt the barbarous locution: "from driving races," when he everywhere else in the instrument shows a knowledge of good English, and introduces his present participles with the conjunction "while"? Ordinary usage requires that the phrase be: "driving *in* a race," if "driving" be used as a participle.

The word "races," without qualification, always and everywhere is taken to mean horse races. If one is mentioned as "following the races," or "playing the races," every one understands that horse races are meant. There are two kinds of horse races, one in which the participating horses are ridden, and the other in which they are driven.

All other races are designated by the name of the class to which they belong, e. g., automobile races, boat races, and foot races.

This usage is general, if not universal.

To treat "riding" and "driving" as participial adjectives is to give this clause its ordinary and natural meaning, and make it grammatical and harmonious. This is the meaning which the words had in policies long before automobiles were invented.

The construction adopted by the majority opinion makes "races" include all speed contests which may be ridden or driven; but no reason is apparent why other races, e. g., yacht races, boat races, swimming races, etc., should not be included in the list.

The fact that insurance policies, or certificates, like the one in this case, are *sold* on solicitation by agents of the insurer, who is responsible for the language used, is a potent reason for applying the rule that, in case of doubt as to the meaning of an instrument, such doubt should be resolved against the one who drew it. Such a doubt exists here, as is shown by the difference of opinion by members of the court.

In a case recently decided by this court (*Finding v. Ocean A. & G. Co.*, 177 P. 142), the opinion, written by the writer of the majority opinion in this case, contains the following:

"In Wood on Fire Insurance, at section 59, it is said: 'It is the duty of the insurer to clothe the contract in language so plain and clear that the insured can not be mistaken or misled. * * * Having the power to impose conditions, and being the party who draws the contract, he must see to it that all conditions are plain, easily understood, and free from ambiguity. * * * Failing to em-

ploy a clear and definite form of expression, the benefit of all doubts will be resolved in favor of the assured."

From *Preferred Accident Ins. Co. v. Fielding*, 35 Colo. 19, 83 Pac. 1013, 9 Ann. Cas. 916, the opinion quotes as follows:

"It is now a well recognized rule that where the terms of a policy of insurance are not clear or are capable of two constructions, the one which is most favorable to the insured will be adopted."

If the language under consideration is not capable of two constructions, and so within the rule thus stated, there could be no reason for an extended discussion of it in the majority opinion.

The judgment should be reversed.

Mr. Justice Burke dissenting:

I am of the opinion that the conclusion reached by Justice Teller in this case in his dissenting opinion is the correct one, and that his reasoning is irrefutable from the standpoint of grammatical construction. But as grammatical construction is often disregarded by the courts if a different construction will give effect to the intention of the parties as disclosed by a consideration of the entire instrument —*Jackson v. Topping*, 1 Wend. (N. Y.) 388, 19 Am. Dec. 515,—it seems to me that illustration will here serve us better than argument.

The language in this policy, over which this contention arises, either means "resulting from riding or driving *in any* races," or "resulting from *any* riding or driving races." It is common usage, when speaking of an automobile race, to speak of "driving" such a race, whereas no one ever speaks of an automobile race as "*a* driving race." Hence, if the first interpretation is correct, the accident in question came within the exception; if the second, then it did not. To reach either conclusion requires careful analysis and construction. The meaning of this clause in this policy is, therefore, to say the least, a matter of grave doubt. When such a doubt exists as to the interpretation of such a

contract, it must be resolved in favor of the assured, as has been held by this court. *Finding v. Ocean A. & G. Co.*, 177 Pac. 142; *Preferred Accident Ins. Co. v. Fielding*, 35 Colo. 19-26, 83 Pac. 1013, 9 Ann. Cas. 916.

Hence the judgment should be reversed.